# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) David Wayne Leonard, | ) |
|     Plaintiff, | ) |
| v. | ) Case No. 23-cv-451-CDL |
| (1) Scott Walton, in his official capacity as Rogers County Sheriff, | ) Attorney Lien Claimed |
| (2) K. Jones, and | ) Jury Trial Requested |
| (3) Turn Key Health Clinics, Inc., | ) |
|     Defendants. | ) |

## **COMPLAINT**

**COMES NOW** the Plaintiff, David Wayne Leonard ("Plaintiff"), by and through his attorneys of record, and for his causes of action against the Defendants, alleges and states as follows:

### **PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, David Wayne Leonard, is a citizen of Oklahoma.

2. Defendant Scott Walton ("Sheriff Walton", "Defendant Walton" or "Sheriff") is, and was at all times relevant hereto, the Sheriff of Rogers County, Oklahoma, residing in Rogers County, Oklahoma and acting under color of state law. Sheriff Walton is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Walton in his official capacity, Plaintiff has brought suit against Rogers County/Rogers County Sheriff's Office ("RCSO"). Rogers County/RCSO is ultimately responsible for the well-being, including the health and safety of inmates housed at the Rogers County Jail. Defendant Walton, as Sheriff and the head

of the Rogers County Sheriff's Office, was, at all times relevant hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of RCSO, including the policies, practices, procedures, and/or customs that violated Mr. Leonard's rights as set forth in this Complaint.

3. Defendant K. Jones ("Deputy Jones") was, at all times relevant hereto, acting under color of state law, and in the scope of his employment as a Deputy for RCSO. Deputy Jones arrested Mr. Leonard on October 19, 2021 and transported him to the Rogers County Jail. Deputy Jones committed underlying violations of Mr. Leonard's Constitutional rights, explained below in more detail.

4. Defendant Turn Key Health Clinics, L.L.C. ("Turn Key") is an Oklahoma limited liability company doing business in Rogers County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including, during the pertinent timeframe, Rogers County, to provide medical professional staffing, supervision and care in county jails. Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Mr. Leonard while he was in the custody of RCSO. Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Rogers County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Rogers County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations. Turn Key is also a recipient of federal funds.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

6. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**STATEMENT OF FACTS**

8. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 7, as though fully set forth herein.

9. Mr. Leonard has long suffered from seizure disorder.

10. On the morning of October 18, 2021, Mr. Leonard, suffered a seizure outside of the Johnny's Quick Stop convenience store in or around Catoosa, Oklahoma.

11. Mr. Leonard was visibly injured at the time, with a black eye and his right arm in a sling. In a state of medical distress, Mr. Leonard told the clerks in Johnny's Quick Stop that he had suffered a seizure and needed help. One of the clerks called 911.

12. At around 9:05am, Deputy Jones arrived outside the Johnny's Quick Stop, ostensibly for "well being check". However, Deputy Jones did nothing to assure Mr. Leonard's well-being.

13. Deputy Jones had knowledge that Mr. Leonard was complaining of suffering from a seizure and requesting medical attention. Upon encountering Mr. Leonard near the Johnny's Quick Stop, Deputy Jones observed that Mr. Leonard had a black eye and was struggling to stand up.

14. Mr. Leonard told Deputy Jones that had suffered a seizure and head injury and needed help.

15. There was no evidence that Mr. Leonard was under the influence of alcohol (no odor of alcohol, glazed eyes, etc.).

16. There was no evidence that Mr. Leonard was under the influence of any narcotic.

17. Nevertheless, without conducting and field sobriety test or horizontal gaze nystagmus test, and otherwise without any probable cause, Deputy Jones arrested Mr. Leonard for "public intoxication."

18. Deputy Jones took Mr. Leonard to the local hospital in part for a blood test. Mr. Leonard tested negative for alcohol. But the attending physician stated his clinical impression that Mr. Leonard had suffered a "closed head injury."

19. Still, Deputy Jones proceeded with the arrest for public intoxication, with an utter want of probable cause, and took Mr. Leonard to the Rogers County Jail for booking.

20. Deputy Jones later drafted a sworn Probable Cause Affidavit which contained information Deputy Jones knew to be false. The Probable Cause Affidavit also omitted exculpatory facts.

21. Specially, Deputy Jones falsely stated in the Probable Cause Affidavit that Mr. Leonard told him that he had "used meth the following night." Mr. Leonard said no such thing.

22. Deputy Jones also excluded from the Probable Cause Affidavit any mention that: (a) the blood test was negative for alcohol; (b) there was no odor of alcohol on Mr. Leonard's

person; (c) Mr. Leonard denied being under the influence of any intoxicant; (d) Deputy Jones performed no field sobriety test or horizontal gaze nystagmus test; (e) a physician's clinical impression was that Mr. Leonard had suffered a closed head injury; and (f) Mr. Leonard told Deputy Jones that he had suffered a seizure and hit his head.

23. Upon booking at the Jail, Mr. Leonard notified Turn Key medical staff and RCSO detention staff that he suffered from seizure disorder and had recently suffered a seizure and hit his head. In addition, Mr. Leonard was visibly injured (black eye) and disoriented. He was unsteady on his feet and presented an obvious fall risk.

24. Nonetheless, with deliberate indifference, Mr. Leonard was placed in a holding cell with no medical monitoring. No precautions were taken to protect him from falling. He was provided no seizure medication or medical care of any kind.

25. While in the Jail, unsupervised and unattended, Mr. Leonard predictably suffered another seizure, fell and suffered a subdural hematoma.

26. Dur to chronic understaffing and overpopulation, Mr. Leonard was not regularly observed, monitored or supervised by Jail staff.

27. Upon information and belief, Mr. Leonard was on the floor of cell for many hours suffering in severe pain, moaning, unresponsive, and in an obvious state of medical distress.

28. During this time period, though infrequently, Mr. Leonard was observed by RCSO detention staff in a state of emergent and obvious medical distress. With deliberate indifference, none of the detention staff took any action to assist Mr. Leonard or help provide him obtain the medical assistance he so obviously needed.

29. After over 24 hours suffering in the Jail in extreme pain with a worsening brain bleed, RCSO released Mr. Leonard on his own recognizance.

30. Upon admission to the Hospital on October 19, 2021, it was discovered that Mr. Leonard had suffered a severe subdural hematoma. This required emergent intervention, including a procedure whereby his skull was opened up and blood drained from atop his brain.

31. Mr. Leonard continues to suffer for headaches and neurologic deficits.

32. The aforementioned acts and/or omissions of Jail staff in being deliberately indifferent to Mr. Leonard's health and safety and violating Mr. Leonard's civil rights are causally connected with customs, practices, and policies which the County/RCSO/Sheriff and Turn Key promulgated, created, implemented and/or possessed responsibility for.

33. Such policies, customs and/or practices include, but are not limited to:

   a. A failure to train staff on how to conduct a proper medical intake for newly booked inmates;

   b. A failure to train staff on how to recognize and respond to an inmate's emergent medical condition;

   c. A practice of failing to adequately assess and treat – and ignoring and disregarding – obvious or known symptoms of emergent and life-threatening conditions;

   d. A failure to refer inmates with obviously serious medical conditions to outside medical professionals;

   e. A lack of physician supervision over the clinical care provided to inmates;

   f. A failure to supervise the medical care and monitoring of inmates with serious medical conditions;

   g. A failure to staff the Jail with personnel capable of assessing, evaluating or treating the serious medical needs of inmates like Mr. Leonard;

h. A failure to properly monitor and supervise inmates, particularly those with obviously serious medical conditions or those thought to be under the influence of alcohol and/or drugs; and

i. A practice of minimizing costs at the expense of inmate medical care.

34. Despite the Jail's maximum capacity of 250 inmates, the Jail regularly held upwards of 300 inmates at a time. During this time many of the inmates were not held in cells and there was not enough bed space for them, so inmates were forced to sleep on the floors.

35. Upon information and belief, the rampant overcrowding made it difficult for RCSO to find qualified individuals to work at the Jail, even if the Jail wished to address its understaffing issue. Former Undersheriff Jon Sappington has stated publicly, "[w]e also don't have the staff to house 250 inmates…[w]e've lost [staff] due to them walking back and seeing all the inmates and saying, 'this isn't for me.'"

36. On information and belief, Sheriff Walton did not hire additional staff to handle the over-populated Jail. This created an unsafe environment where . In fact, Sheriff Walton publicly admitted that the Jail was way over capacity and the Jail "is a dangerous facility." Yet, despite these admissions, Sheriff Walton did nothing during this 8-year time period to decrease the Jail population and or the dangers created by the Jail's overpopulation.

37. Upon information and belief, Sheriff Walton was actually financially incentivized to ***not*** address the issue of Jail overcrowding. By agreeing to house Oklahoma Department of Corrections ("DOC") inmates, Sheriff Walton has ensured that the Jail receives extra revenue that totals $100,000 - $250,000/year.

38. There was also an understaffing rendered it impossible to properly monitor and supervise inmates with obvious and serious medical conditions like Mr. Leonard.

**CLAIMS FOR RELIEF**

# I.

## WRONGFUL ARREST IN VIOLATION OF THE FOURTH AND/OR FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)
### (Deputy Jones)

39. Paragraphs 1-38 are incorporated herein by reference.

40. In determining the existence of probable cause, Courts are required to exclude false or manufactured evidence and include exculpatory evidence that was omitted or suppressed by law enforcement.

41. When one considers the false evidence that was included in the Probable Cause Affidavit and the evidence that was omitted, ignored or suppressed by Deputy Jones, there was plainly no probable cause for the arrest of Mr. Leonard for public intoxication.

42. This wrongful arrest lacked probable cause, as required by the Fourth Amendment, as applied to the States by the Fourteenth Amendment. This wrongful arrest violated Mr. Leonard's Fourth Amendment right to be secure against unreasonable seizure and violated Mr. Leonard's Fourth Amendment-protected sense of security and individual dignity.

43. This wrongful arrest was a proximate cause of Mr. Leonard's imprisonment, exacerbated physical injuries, emotional distress, pain and suffering, and the damages as alleged herein.

# II.

## VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

### A. Deputy Jones

44. Paragraphs 1-43 are incorporated herein by reference.

45. Mr. Leonard had medical needs that were sufficiently serious, objectively, to be of a Constitutional dimension.

46. Mr. Leonard had serious medical needs that were known or obvious.

47. As described above, Deputy Jones knew -- or it was obvious -- that Mr. Leonard was at substantial risk of serious harm.

48. Deputy Jones disregarded these known and obvious risks in deliberate indifference to Mr. Leonard's serious medical needs.

49. As a direct and proximate result of this deliberate indifference, as described above, Mr. Leonard experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation and embarrassment.

50. As direct and proximate result of Officer Sanders' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Leonard's rights secured by the U.S. Constitution.

### C. Jail Staff/Turn Key Staff/Underlying Violations

51. Paragraphs 1-50 are incorporated herein by reference.

52. The Jail detention staff and Turn Key staff who encountered Mr. Leonard at the Jail, including the booking staff, knew -- or it was objectively obvious -- that there were substantial risks to Mr. Leonard's health and safety.

53. Mr. Leonard had serious medical needs that were known or obvious.

54. As described *supra*, Mr. Leonard had serious and emergent medical issues that were known and/or obvious to the Jail detention staff and Turn Key staff. It was obvious that Mr. Leonard needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and/or obstructed. Indeed, Mr. Leonard was left to

languish in a cell for over 24 hours, despite his obvious and serious medical needs. Jail detention staff and Turn Key staff disregarded the known, obvious and substantial risks to Mr. Leonard's health and safety.

55. As a direct and proximate result of this deliberate indifference, as described above, Mr. Leonard experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

56. As direct and proximate result of Jail staff's conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Leonard's rights secured by the U.S. Constitution.

### C. Official Capacity/Municipal Liability

57. Paragraphs 1-56 are incorporated herein by reference.

58. The County/RCSO/Sheriff and Turn Key failed to provide constitutionally sufficient medical care for inmates and training and supervision to Jail staff for the assessment, evaluation, and treatment of serious medical conditions.

59. The aforementioned acts and/or omissions of Jail and Turn Key staff in being deliberately indifferent to Mr. Leonard's health and safety and violating Mr. Leonard's civil rights are causally connected with customs, practices, and policies which the County/RCSO/Sheriff and Turn Key promulgated, created, implemented and/or possessed responsibility for.

60. Such policies, customs and/or practices include, but are not limited to:

    a. A failure to train staff on how to conduct a proper medical intake for newly booked inmates;

    b. A failure to train staff on how to recognize and respond to an inmate's emergent medical condition;

c. A practice of failing to adequately assess and treat – and ignoring and disregarding – obvious or known symptoms of emergent and life-threatening conditions;

d. A failure to refer inmates with obviously serious medical conditions to outside medical professionals;

e. A lack of physician supervision over the clinical care provided to inmates;

f. A failure to supervise the medical care and monitoring of inmates with serious medical conditions;

g. A failure to staff the Jail with personnel capable of assessing, evaluating or treating the serious medical needs of inmates like Mr. Leonard;

h. A failure to properly monitor and supervise inmates, particularly those with obviously serious medical conditions or those thought to be under the influence of alcohol and/or drugs; and

i. A practice of minimizing costs at the expense of inmate medical care.

61. Pursuant to the polices, customs, and/or practices listed above, Mr. Leonard: did not receive an adequate medical intake, was not placed on any protocols that would ensure he was monitored more closely due to suffering from a serious medical condition, was never seen by *any* physician or other qualified medical staff while he was at the Jail, and was not referred to an outside medical provider in a timely manner, despite his obvious symptoms of a serious medical condition.

62. The risks to inmates like Mr. Leonard presented by the maintenance of such a deficient medical delivery system were substantial and obvious such that County/RCSO/Sheriff and Turn Key should have known them.

63. The County/RCSO/Sheriff and Turn Key failed to take reasonable measures to alleviate those risks.

64. In addition, due to the chronic overcrowding and understaffing of the Jail, Mr. Leonard was regularly and adequately monitored and supervised despite his obviously dire condition.

65. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Leonard suffered injuries and damages as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

***ATTORNEYS FOR PLAINTIFF***